IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2008

### STATE OF TENNESSEE v. ALVIN GREEN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08074     W. Mark Ward, Judge**

_____

**No. W2007-00570-CCA-R3-CD  - Filed May 19, 2008**

_____

The defendant, Alvin Green, was convicted of three counts of especially aggravated kidnapping and two counts of attempted aggravated robbery and received an effective sentence of forty-six years in the Department of Correction.  On appeal, he argues that the evidence was insufficient to support his convictions because the State did not adequately rebut his defense of duress.  Further, he argues that the trial court erred in permitting the State to introduce his statements soliciting the murder of the State's witnesses; by allowing a lay witness to testify regarding the operation of the weapon used during the offenses; and in applying an enhancement factor and imposing consecutive sentences. After review, we affirm the judgments of the trial court and remand for entry of a corrected judgment in Count 4 to reflect that the defendant was convicted of attempted aggravated robbery, a Class C felony, rather than attempted robbery.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES, J., joined.  J.C. MCLIN, J., not participating.

Kevin E. Childress, Memphis, Tennessee, for the appellant, Alvin Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

**State's Proof**

Chuck Mays, a member of the Special Weapons and Tactics (SWAT) team of the Shelby County Sheriff's Department, testified that he was dispatched to 8555 Highway 70 around midday on September 5, 2003, to respond to a possible hostage situation at a residence. When he arrived, sheriff's deputies were already on the scene controlling traffic. Mays testified that his team of approximately ten officers set up a command post one-quarter mile from the residence. He and his partner took a position on the northeast side of the driveway facing the house. After about ninety minutes, he saw Marion Gelston, one of the victims, and the defendant walk out onto the carport. The defendant was holding a rifle. Mr. Gelston remained in the carport while the defendant walked down the driveway to a maroon Nissan truck and placed the rifle inside. Mays and his partner then approached the defendant and took him into custody.

Patricia Gelston testified that she resided with her husband, Marion Gelston, at 8555 Highway 70 in Arlington. On September 5, 2003, she and her husband were both at home when the defendant arrived around 11:00 a.m. to inquire about a car they were selling. Mrs. Gelston showed the vehicle to the defendant, and then Mr. Gelston took the defendant out for a test drive. After the test drive, the defendant told the Gelstons he needed to think about whether he would purchase the car and visit a bank to discuss financing. He left and returned approximately thirty minutes later.

When the defendant returned, he negotiated with Mr. Gelston about the price of the car and left again. As he was leaving, he told the Gelstons he would return within one-half hour if he decided to purchase the car. Approximately twenty-five minutes later, Mrs. Gelston noticed the defendant's truck in her driveway. Mr. Gelston and the defendant then walked into the kitchen, with the defendant holding a gun to Mr. Gelston's back. Mrs. Gelston offered to sign the car's title over to the defendant if he would leave. He refused and told Mrs. Gelston that his interest in the car was just a pretext to gain access to the Gelstons' home and that he wanted money. He forced Mr. and Mrs. Gelston upstairs at gunpoint to retrieve a bank statement. After Mrs. Gelston showed the defendant a statement reflecting a balance of seven thousand dollars, the defendant told Mrs. Gelston to go to her bank and withdraw the entire amount. Before leaving, Mrs. Gelston placed two calls to her daughter-in-law, ostensibly to tell her that a birthday party planned for later that day had been cancelled. However, her real purpose in making these calls was to signal her daughter-in-law to summon help.

As Mrs. Gelston left to go to the bank, she saw a sheriff's deputy stopped on Highway 70, prepared to turn into her driveway. Because she did not want the defendant to see the marked patrol car, she motioned for the officer to follow her and pulled into a gravel driveway a short distance from her house. She informed the officer of the situation and waited with him in the driveway until the defendant was taken into custody. On cross-examination, Mrs. Gelston testified that the defendant's demeanor was calm, he did not raise his voice, and he told her "he was sorry but that he needed the money."

Stacy Berretta, the Gelstons' daughter-in-law, testified that she received two phone calls from Mrs. Gelston on September 5, 2003. She said that the first call "did not sound like a normal friendly

conversation" and that Mrs. Gelston sounded odd. When Ms. Berretta received the second call, she suspected that something was wrong and dialed 9-1-1 after speaking with Mrs. Gelston.

Shelby County Sheriff's Deputy Ronnie Sewell testified that he met Mrs. Gelston at the entrance to her driveway on September 5, 2003, and followed her to the gravel driveway. When she told him she needed to go to the bank, he instructed her to remain with him and called a supervisor. Deputy Sewell remained with Mrs. Gelston for several hours until the defendant was taken into custody.

The Gelstons' son, Mark Berretta, received a call from his sister-in-law, Stacy, regarding his parents on September 5, 2003, around 2:00 p.m. Afterwards, he drove from his workplace to his parents' house. When he arrived, his mother's car was gone and there was an unfamiliar red Nissan truck in the driveway. He went to the back of the truck, picked up a vacuum cleaner attachment, and approached the back door, which was locked. Mr. Berretta looked through a window and saw his father, who was waving him off. He returned the vacuum cleaner attachment to the truck and then received a call from his father telling him to come inside. He entered and saw the defendant holding a rifle and motioning him to sit down. The defendant instructed Mr. Berretta to phone his mother to ascertain her whereabouts. Mr. Berretta called at least three times but received no response. Eventually, the defendant told him to go find Mrs. Gelston. When he left the house, he was detained by sheriff's deputies until the defendant was taken into custody. Mr. Berretta testified that the defendant possessed the firearm during their entire encounter. He was able to get a good look at the weapon but could not tell whether the rifle's safety was on or off because the defendant's hand was covering it. On cross-examination, Mr. Berretta testified that the defendant told him he was sorry and needed the money.

Marion Gelston testified that he was standing on his carport putting his lawnmower away when the defendant arrived at his home for the third time on September 5, 2003. The defendant approached him carrying a rifle and told Mr. Gelston, "I hate to do this, but I'm going to rob you." The defendant asked where Mrs. Gelston was, and when Mr. Gelston told him she was in the house, he ordered Mr. Gelston inside. He told the Gelstons that he wanted to see a bank statement, and the three went upstairs to retrieve it. The defendant told Mrs. Gelston to go to the bank and withdraw the entire balance of the account. Mr. Gelston testified that after his son arrived, they unsuccessfully attempted to convince the defendant to give up and leave. The defendant then allowed Mr. Berretta to leave to search for Mrs. Gelston. He spoke with Mr. Gelston for around forty minutes before deciding that they should go look for Mr. Berretta and Mrs. Gelston. When they exited the house, the defendant placed the rifle in his truck and was apprehended.

Detective Raymond Sides of the Shelby County Sheriff's Department investigated the Gelston residence on September 5, 2003, after the defendant was taken into custody. He identified two photographs of the rifle recovered from the defendant's truck, and testified that one of the photographs depicted the rifle's safety in the "off" position.

Detective Patrick Fox of the Memphis Police Department Organized Crime Unit testified that he overheard a phone conversation in which the defendant stated that "he no longer wanted the victims of this case to exist any more. He did not want them to make it to court to be able to testify against him." The defendant said that he wanted some Hispanic or Mexican persons to murder the victims, believing they could not easily be traced back to him. He negotiated a price of $10,000 to kill all three victims and stated that he wished to be out of town when the murders occurred, again in the hope that this would help him avoid detection.

On cross-examination, Detective Fox testified that he first heard the defendant's voice around December 19, 2003, during a phone conversation between the defendant and a confidential informant working with the Memphis Police Department. He said he personally heard the defendant's voice between six and ten times and acknowledged that the informant and the defendant engaged in other conversations he did not hear. Detective Fox testified that during the first conversation he witnessed between the defendant and the informant, the informant initiated the discussion of murdering the victims. He said no money was exchanged and no specific arrangements were made for the murders.

**Defense Proof**

The defendant testified that he began transporting drugs between Texas and Mississippi in the early 1990's. He decided around 2000 that he no longer wished to transport drugs because he faced large amounts of jail time if caught. He said that when he informed his superiors of this decision, they told him he could "buy [his] way out," beginning with payments of $5000 per month and escalating to $20,000 per month. He testified that he was initially able to make the monthly payments but had difficulty making them in July and September 2003.

In September 2003, the defendant needed money to make his payment and attempted to win money by gambling in Tunica, Mississippi, but was unsuccessful, losing approximately $10,000. He met with three individuals at a hotel in Tunica to inform them that he was $10,000 shy of making his scheduled payment. These individuals told the defendant that they had "a job" for him to do and that, if he did not acquire the money, they would harm him and his family. The defendant testified that this frightened him because he had previously seen these individuals kill others.

The three individuals told the defendant that his job was to take elderly people hostage and rob them and instructed him to purchase a weapon from a Wal-Mart in Hernando, Mississippi. The three individuals followed the defendant to Wal-Mart and then to two houses in Memphis which were unoccupied when they arrived. They then led the defendant to the Gelston residence, and instructed him to use the car for sale as a pretext to gain entry to the house. The defendant spoke with the Gelstons and test drove the car. He then left the Gelston residence and drove to a nearby real estate development project where the three individuals were waiting. He told them that no one was home, but they did not believe him and told him to return to the house.

The defendant returned and negotiated with Mr. Gelston about the price of the car. He told the Gelstons he was leaving again to try to secure a loan for the purchase. He returned to the real

estate project and again told the three individuals that the Gelstons were not home. They did not believe him and told him to go back to the house and that he and his family would be killed if he did not return with the money. The defendant returned to the house, removed the rifle from his truck, and confronted Mr. Gelston. The defendant apologized to Mr. Gelston and told him that he had to rob him because "they" were threatening him. He followed Mr. Gelston into the house, explained that he did not wish to hurt anyone, and asked for money to take to the three individuals. Mrs. Gelston told him that she was expecting visitors, and the defendant allowed her to call her daughter-in-law to tell them not to come. He then ordered the Gelstons to accompany him upstairs to retrieve a bank statement. Afterwards, they descended the stairs and Mrs. Gelston made a second call to her daughter-in-law. The defendant then told the Gelstons to decide who would go to the bank to withdraw the money.

While Mrs. Gelston was gone, Mr. Berretta approached the house. The defendant initially told Mr. Gelston not to allow him inside the house but then changed his mind. When Mr. Berretta entered the house, the defendant told him not to worry, that he did not intend to harm anyone, and that he was in a bad way and needed money. Mr. Berretta expressed concern about his mother's health, and the defendant allowed him to leave to find her. Later, after Mrs. Gelston had not returned, the defendant decided to take Mr. Gelston to find her, using Mr. Gelston's vehicle. He elected to leave the rifle in his truck, so he unloaded it and walked to the truck while Mr. Gelston waited at the carport. When he placed the rifle in the truck, he was apprehended by SWAT officers.

The defendant testified that he was unwilling to reveal the names of the three individuals forcing him to rob the Gelstons because they remained at large and he was afraid they would seek retribution against him. He said he did not call the police while he was inside the Gelstons' house because of the threat against him and his family. Regarding Detective Fox's testimony about the conversations with the confidential informant, the defendant testified that the informant's brother brokered the initial conversation between the informant and the defendant. The defendant said he told the informant's brother he was not interested in having the victims murdered but acknowledged he discussed a drug deal with the informant. He stated that he discussed the drug deal to determine if the informant was capable of completing the transaction, in the hopes of testifying against him in exchange for a reduced sentence on his current charges.

On cross-examination, the defendant acknowledged that he did not report the three individuals to any law enforcement agency throughout his entire tenure as a drug courier. He said he could not recall the name of the hotel in Tunica where he met the three individuals to disclose that he could not make his September 2003 payment. He testified that his wife and children moved to Nashville in July and that the three individuals did not know his address in Nashville.

The defendant stated that after purchasing the rifle, he spent the night of September 4, 2003, in his truck in a parking lot in south Memphis, unaccompanied by the three individuals. He met them around 8:00 a.m. on September 5 at a gas station in Memphis, where they instructed him to follow them to the three houses. He acknowledged that the three individuals rode in a separate vehicle during their travels on September 5, and no one rode in his truck and held a gun to him.

The defense recalled Patricia Gelston, who testified that the defendant apologized to her and told her he needed the money and that his wife and children were being held at gunpoint. On cross-examination Mrs. Gelston testified that the defendant did not appear scared, nervous, or worried about his family.

The defense also recalled Marion Gelston, who testified that the defendant said someone was holding his family and had instructed him to force Mr. Gelston to produce a bank statement and withdraw the money. On cross-examination, Mr. Gelston testified, as had his wife, that the defendant did not seem nervous, scared, or worried about his family. He said that although the defendant had a cell phone, he never called to check on his family.

Following deliberations, the jury found the defendant guilty of the especially aggravated kidnappings of Patricia Gelston, Marion Gelston, and Mark Berretta and the attempted aggravated robberies of Patricia Gelston and Marion Gelston.

**Sentencing Hearing**

Patricia Gelston testified about the impact the crime had on her family and said that her family felt "terroriz[ed]" by the defendant's actions. Marion Gelston testified that the crime had affected the way his family lives by making them more cautious about watching who comes to their house.

Shelby County Sheriff's Department Detective Chris Harris testified that following the defendant's trial, members of the Shelby County Jail staff asked him to open an investigation because they had intercepted a letter from an inmate sharing a cell with the defendant. The letter requested that a female appear at the defendant's sentencing hearing and provide personal information about the defendant in exchange for money. Harris testified that the letter contained information about the defendant's birth date, hometown, physical characteristics, and children. After receiving the letter, Harris opened an investigation but discovered nothing else out of the ordinary. On cross-examination, he acknowledged that he did not see the letter being written.

For the defense, Dr. Joseph Angelillo, a clinical psychologist, testified that he examined the defendant six times following his arrest and found that he suffered from major depression and a high level of anxiety. He stated that the defendant had a schizoid personality, meaning he was withdrawn and preferred to be alone. The defendant told Dr. Angelillo that he heard voices which insulted him. Dr. Angelillo said the defendant was motivated to seek the approval of others and be seen as a good, bright, and successful person. He testified that the defendant was not sociopathic and that his mental state at the time of the crimes did not prevent his knowing that his actions were wrong.

The trial court found that the defendant was a Range I, standard offender for purposes of the attempted aggravated robbery convictions and a Range I, violent offender for purposes of the especially aggravated kidnapping convictions. After discussing Tennessee's sentencing statutes, principles, and guidelines which the court would follow, one enhancement factor was applied:

With that in mind, I am first directed to look at the enhancement factors. I do find enhancement factor on my list, number two;

The defendant has a previous history of criminal convictions, or criminal behavior in addition to those necessary to establish the appropriate range.

The defendant has no criminal convictions, but he does have a history of criminal behavior. And I will state that I find this, primarily, based upon the defendant's testimony at the trial that he ran drugs for thirteen to fourteen years for three individuals, during which time he observed people being killed.

Somewhere around the year 2000 he wanted out and they required him to give then $5,000.00 a month.

Basically, he testified about being a drug runner for thirteen to fourteen years.

The trial court reviewed at length what mitigating factors might be applicable. The court determined that, based upon the psychological evaluation of the defendant, factor (8), he was suffering from a mental or physical condition that significantly reduced his culpability, was applicable, although little weight was afforded to it. The court determined that the defendant's claim of duress was not entitled to be treated as a mitigating factor, pursuant to factor (12), for the court found it to be both "incredible" and not worthy of belief. Applying the applicable enhancement and mitigating factors, the court sentenced the defendant to twenty-one years for each of the especially aggravated kidnapping convictions, noting that the defendant would not be eligible for parole on the sentences. The court sentenced the defendant to four years on the attempted aggravated robberies. As for whether the sentences should be served consecutively, as the State had requested, the court found to be applicable several of the factors on which consecutive sentencing could be based:

I do find that, especially in the circumstances regarding the attempt to solicit the killing of these victims. I do believe under any interpretation by the United States Supreme Court that I may consider this for consecutive and concurrent sentencing purposes. And so I do find him to be a dangerous offender.

Based upon that, I do find, also, that confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity and furtherance of an anti-societal lifestyle.

I do find that the aggregate length of the sentences reasonably relate to the offense for which the defendant stands convicted.

. . . .

. . . I am hard pressed not to find him a dangerous offender based upon this solicitation to kill these people. If under the law I can base the aggravation on criminal activity for which the defendant is not currently being sentenced, then that would be applicable.

More importantly to me, though, I believe two other things are applicable in this case that the state has not asked me for.

Number one, the defendant is an offender who[se] record of criminal activity is extensive.

. . . .

Again, the defendant testified that he ran drugs for thirteen, or fourteen years, in which he observed people getting killed.

. . . .

More importantly, and even more applicable, I find that the defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of his livelihood.

Again, I find that based upon his testimony about his drug running for thirteen or fourteen years.

Also, the presentence report only reflects one job. He testified that he decided – if anything he said is true, which I am going to take this part of being a drug runner is true, he decided somewhere around 1999, or 2000 to get out of the drug running business. The only job that's listed in the presentence report is a job that he started around 2000, where he made, according to the presentence report, $72,000.00 a year. A little over $6,000.00 a month, yet he has to pay $5,000.00 a month to these people to keep him out of trouble, assuming this is true.

Not only was he a drug runner for thirteen, or fourteen years, he was, apparently, continuing his life of crime, if his story is true, to support this.

I think combined upon his own admissions in Court as being a drug runner for thirteen, or fourteen years and his lack of any indication of a prior employment history in the presentence report, he is a person who qualifies as a professional criminal.

. . . .

[W]ith all of those considerations in mind I have decided to run count one and two, twenty-one years, each, I am going to run those concurrent to each other, but consecutive to count three, twenty-one years as to the son.

When the defendant first arrived he had two people that he was holding, those two people, that will be concurrent time. It will be consecutive for the son who arrived later and was held. I think that that is a significantly different and additional culpability there.

With regards to the criminal attempt[ed] aggravated robberies, I am going to run those concurrent to each other, but consecutive to the first and third counts.

All that together, according to my calculation is an effective sentence of forty-six years. Forty-two years without parole and after he serves that, four years with parole.

## ANALYSIS

The defendant presents four issues for our review. He argues that the evidence was insufficient to support his convictions and that the trial court erred in allowing the State to introduce statements in which he solicited the murder of the victims, in permitting a lay witness to testify regarding the operation of the rifle used in the offenses, and in sentencing him to an effective forty-six-year sentence. The State responds that the evidence was sufficient to support the defendant's convictions and that the trial court did not err in the admission of evidence or the sentencing of the defendant.

## I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions because he asserted a defense of duress and, in his view, the State did not meet its burden of rebutting that defense. The State counters in the alternative, arguing that the defendant did not sufficiently establish the defense of duress and that the defense was not available because he had a reasonable opportunity to escape the compulsion without committing an offense and knowingly became involved in a situation in which it was likely that he would be subjected to compulsion.

Where sufficiency of the convicting evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court explained the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Especially aggravated kidnapping is, *inter alia*, the knowing removal or confinement of a person so as to substantially interfere with that person's liberty, when accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-302(a), -305(a)(1) (2003). Aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, when accomplished with a deadly weapon. Id. §§ 39-13-401(a), -402(a)(1). As relevant here, a person commits criminal attempt who acts with intent to cause a result that is an element of the offense and believes the conduct will cause the result without further conduct on the person's part. Id. § 39-12-101(a)(2).

Tennessee Code Annotated section 39-11-504 provides:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

(b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

If admissible evidence supporting a duress defense is introduced, the State must negate the defense beyond a reasonable doubt before the defendant may be convicted. Tenn. Code Ann. § 39-11-201(a)(3) (2003).

We will review whether the defendant introduced sufficient evidence of duress to trigger the State's responsibility to negate the defense beyond a reasonable doubt. To support the defense, the defendant offered only his self-serving testimony, which was non-specific in several material respects. He refused to provide the names of the three individuals who allegedly coerced him into the kidnappings and attempted robberies. While he articulated a generalized apprehension that these three individuals would harm him and his family if he did not comply with their orders, he did not provide a specific basis for his belief that his family was in imminent and impending danger. In rebuttal, the State introduced evidence that, the night before the offenses, the defendant was alone in a Wal-Mart parking lot with access to a cell phone, providing ample opportunity to seek assistance from law enforcement rather than commit the offenses.

The jury was instructed on the definition of duress and told that if evidence was introduced supporting the defense of duress, the State had the burden to rebut the defense beyond a reasonable doubt and that any reasonable doubt on the issue of whether the defendant acted from duress required the defendant to be found not guilty. The jury is presumed to follow its instructions. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). The jury's guilty verdicts indicate that it found that the State rebutted the defendant's duress defense beyond a reasonable doubt, and the record is sufficient for a reasonable jury to make this determination.

To the extent that the defendant challenges generally the sufficiency of the evidence, we conclude that his claim is without merit. The proof at trial, viewed in the light most favorable to the State, showed that the defendant, brandishing a loaded rifle, entered the home of Marion and Patricia Gelston. He knowingly confined the Gelstons and their son, Mark Berretta, and attempted to take money from the Gelstons through fear by ordering Mrs. Gelston to withdraw money from their bank while holding Mr. Gelston at gunpoint. The evidence was sufficient to support the defendant's convictions for especially aggravated kidnapping and attempted aggravated robbery.

## II. Evidentiary Rulings

The defendant argues that the trial court erred in admitting testimony regarding the defendant's solicitation of the murder of the victims and the operation of the rifle the defendant used in the offenses. The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). As our supreme court has explained:

Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"

Gilliland, 22 S.W.3d at 270 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

## A. Testimony Regarding Solicitation of the Victims' Murder

The defendant argues that the trial court should have excluded evidence that he solicited the murder of the victims because it was irrelevant and, alternatively, because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The State responds that the trial court properly admitted the evidence as relevant to demonstrate the defendant's consciousness of guilt and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. As we will explain, we agree with the State.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. Such evidence is admissible for other purposes, however, provided that the trial court (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). Generally, Rule 404(b) is one of exclusion, and evidence that an accused has committed some other crime or bad act independent of that for which he is charged is inadmissible, even though it may be a crime or act of the same character as that for which the accused is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence that a defendant has committed a crime separate from the one for which he is being tried is relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. See id.

"Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978). "Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the

making of such threats evinces a consciousness of guilt." State v. Austin, 87 S.W.3d 447, 477 (Tenn. 2002).

During the State's case-in-chief, defense counsel requested a jury-out hearing regarding the admissibility of the testimony of Detective Fox, who would testify about telephone conversations he overheard between the defendant and a confidential informant in which the defendant solicited the murder of the victims. During this hearing, Detective Fox testified that the defendant told the informant that he "wanted those subjects that were on his case physically removed so that they would not be able to come and testify against him." The defendant said there were two individuals, who lived together, and their son, who lived at a different address. The defendant said that, after the murder, he would cease contact with the informant so their phone calls would not be traced and discussed with the informant potential alibis for the time of the murder.

Following Detective Fox's testimony, the trial court considered its admissibility:

> Well, I beli[e]ve this is governed by [Tennessee] Rule [of Evidence] 404(b), and if it's not, I would rather be safe and determine that it is 404(b).
>
> . . . .
>
> I've had a jury out hearing. The question for me is that I might must determine [sic] if the evidence is relevant to a material issue other than propensity.
>
> And I must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.
>
> . . . .
>
> . . . I do think it's relevant. I do think that it certainly goes to show the defendant's consciousness of guilt.
>
> And so I think it's . . . highly relevant that someone with a pending trial would solicit someone to kill the witnesses against him. I mean, I think it's extremely – extremely relevant.
>
> . . . .
>
> But I do think it's relevant and as far as weighing the probative value versus the prejudicial effect, I don't find that the probative value is outweighed by the danger of unfair prejudice.

The trial court determined that Detective Fox's testimony was relevant and admissible as proof of another crime, wrong, or act because it was offered for a purpose other than to prove

-13-

conduct in conformity with a character trait, *i.e.* to show consciousness of guilt. The record supports this determination.

## B. Lay Witness Testimony Regarding the Rifle's Operation

The defendant argues that the trial court erred in permitting Mark Berretta, a former Tennessee State Guard member with federal law enforcement training and experience with weapons, "to examine the weapon used by the [defendant], to give extensive testimony regarding the technical operation of the weapon, and to give testimony from a photograph regarding the gun safety feature not being activated during the commission of the offense." He contends that, because Berretta was not accepted by the court as a ballistics expert, he should not have been permitted to offer such "technical or specialized testimony" regarding the rifle. He also asserts that the testimony should have been excluded for irrelevance. The State responds that the defendant has waived this issue by failing to raise it in his motion for new trial.

Issues related to the admission or exclusion of evidence which are not specifically stated in a motion for a new trial are treated as waived on appeal. Tenn. R. App. P. 3(e). However, even if we were to reach the merits of the defendant's argument, he would not be entitled to relief. Berretta testified about the operation of the rifle's safety and demonstrated whether one could see if the safety was engaged or disengaged while the rifle was being held. The trial court correctly found that such testimony did not require the specialized knowledge of an expert. Berretta's opinions were rationally based on his experience and training as a law enforcement officer and helpful to a clear understanding of his testimony. See State v. Augustine John Lopez, III, No. M2003-02307-CCA-R3-CD, 2005 WL 1521826, at *7 (Tenn. Crim. App. June 28, 2005), perm. to appeal denied (Tenn. Dec. 5, 2005) (police officer's testimony regarding how the orientation of a fingerprint may reveal how an item was held did not require the qualification of an expert because it was rationally based upon his experience and training and was helpful in understanding a fact in issue in the case). This assignment is without merit.

## III. Sentencing

The defendant argues that the trial court erred in sentencing him to an effective forty-six-year sentence. He asserts that the trial court improperly applied the previous criminal history enhancement factor because, in his view, the court made contradictory findings regarding the credibility of his testimony. He contends that it was improper for the court to credit his testimony that he transported drugs for many years in applying the enhancement factor, yet refuse to credit his testimony regarding proof of duress while considering mitigating factors. He also argues that the trial court erred in imposing consecutive sentencing. The State responds that the assessment of witness credibility is entrusted to the sound discretion of the trial court, the court properly considered the sentencing principles and all relevant facts and circumstances, and the court properly imposed consecutive sentencing. As we will explain, we agree with the State that the trial court properly sentenced the defendant.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). Enhancement factors may be considered only if they are "appropriate for the offense," and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114 (2003).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous. If our review reflects that the trial court, following the statutory sentencing procedure, imposed a lawful sentence, after having given due consideration and proper weight to the factors and principles set out under the sentencing law and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Initially, we note that, from the record, it is clear that the trial court thoroughly considered the relevant sentencing principles, facts, and circumstances. Therefore, our review is *de novo* with a presumption that the trial court's determinations were correct.

## A. Application of Previous Criminal History Enhancement Factor

The defendant argues that the trial court should not have applied the previous criminal history enhancement factor to his sentences because the court credited his testimony regarding his extensive activity as a drug courier, but did not credit that regarding his claim of duress. We disagree with the defendant that these findings are "contradictory." There is nothing inherently inconsistent in the trial

-15-

court's findings that the defendant transported drugs for the three individuals for many years, yet the three individuals did not coerce the defendant into committing the offenses against the victims. Regardless, the defendant cites no authority for the proposition that a trial court must accredit either all or none of a witness's testimony. "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The defendant is not entitled to relief on this issue.

## B. Consecutive Sentencing

The defendant also challenges the trial court's imposition of consecutive sentencing, arguing that the court erred by finding him to be a dangerous offender. He contends that the trial court improperly considered his solicitation of the murder of the victims in finding that his behavior indicated little or no regard for human life. The State responds that, since the trial court found two additional alternative bases for imposing consecutive sentencing, the imposition of consecutive sentencing was proper, regardless of whether the court erred in finding the defendant was a dangerous offender. As we will explain, we agree with the State.

As a general rule, consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the following statutory criteria:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person as declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

-16-

Tenn. Code Ann. § 40-35-115(b) (2003). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

As the basis for consecutive sentencing, the trial court applied three of the seven statutory criteria:

I think combined upon his [the defendant's] own admissions in Court as being a drug runner for thirteen, or fourteen years and his lack of any indication of a prior employment history in the presentence report, he is a person who qualifies as a professional criminal.

And I base that upon many decisions of the Court of Criminal Appeals. So I do find him primarily to be a professional criminal, number one.

Number two, that the defendant's record of criminal activity is extensive, as I have interpreted the record, and;

Number three, to be a dangerous offender, assuming that I can take into consideration the solicitation of murder.

So I think that there are three reasons that justify consecutive sentencing in this matter.

The defendant challenges only the trial court's finding that he is a dangerous offender, not its findings that he is a professional criminal or has an extensive record of criminal activity. Therefore, we need not determine whether the trial court was correct in finding the defendant a dangerous offender because even were we to find that this determination was erroneous, there remain two alternative bases for imposing consecutive sentencing. The existence of any one of the seven criteria of Tennessee Code Annotated section 40-35-115(b) is sufficient to justify the imposition of consecutive sentencing. State v. Alder, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001). This assignment is without merit.

### IV. Clerical Error in Judgment

Although not called to our attention by either party, our review of the appellate record reveals that the judgment for Count 4 contains a clerical error. The judgment lists the conviction offense as "CA: Robb" and does not indicate the conviction class. The record reflects that, on this count, the defendant was convicted of criminal attempt to commit *aggravated* robbery, a Class C felony. Accordingly, we remand the matter to the trial court for entry of a corrected judgment reflecting the correct conviction offense and felony class. In all other respects, the judgments of the trial court are affirmed.

### CONCLUSION

Based on the foregoing reasoning and authorities, the judgments of the trial court are affirmed, and this matter is remanded to the trial court for entry of a corrected judgment in Count 4, as set out herein.

_____
ALAN E. GLENN, JUDGE